UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MAXWELL GEDEUS,<br><br>*Plaintiff*,<br><br>vs.<br><br>MULLER, INC.; FRANCIS MCMAHON; JOHN HOUCK; RYAN REIGEL; ABC COMPANIES 1-5 (FICTITIOUS NAMES DESCRIBING PRESENTLY unidentified business entities); and JOHN DOES 1-5 (fictitious names of presently unidentified individuals),<br><br>*Defendants*. | No.  2:26-cv-1415<br><br><br>**COMPLAINT &**<br>**DEMAND FOR TRIAL BY JURY** |

Plaintiff Maxwell Gedeus ("Plaintiff"), by way of this Complaint against Defendants Muller, Inc. ("Defendant Muller" or "Corporate Defendant"), Francis McMahon ("Defendant McMahon"), John Houck ("Defendant Houck"), and Ryan Riegel ("Defendant Reigel") (collectively, "Individual Defendants") (together with Corporate Defendant, "Defendants") alleges as follows:

**PARTIES**

1. Plaintiff is an individual residing in Cheltenham, Pennsylvania. At all times relevant hereto, Plaintiff was employed by Corporate Defendant.

2. Defendant Muller is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a main business address of 2800 Grant Avenue, Philadelphia, PA 19114.

3. Defendant McMahon is, at all times relevant hereto, employed by Corporate Defendant as Area Sales Manager. This claim is brought against Defendant McMahon in his

individual capacity and/or as an agent, servant, representative, and/or employee of Corporate Defendant during the course of his employment.

4. Defendant Houck is, at all times relevant hereto, employed by Corporate Defendant as Vice President of Sales. This claim is brought against Defendant Houck in his individual capacity and/or as an agent, servant, representative, and/or employee of Corporate Defendant during the course of his employment.

5. Defendant Reigel is, at all times relevant hereto, employed by Corporate Defendant as Director of Sales–Grocery and Convenience. This claim is brought against Defendant Reigel in his individual capacity and/or as an agent, servant, representative, and/or employee of Corporate Defendant during the course of his employment.

6. Defendant ABC Corporations 1 through 5 are currently unidentified business entities who have acted in concert with Corporate Defendant, and/or currently unidentified business entities responsible for the creation and/or implementation of anti-discrimination policies of Corporate Defendant, and/or currently unidentified business entities who have liability for the damages suffered by Plaintiff under any theory advanced herein.

7. Defendants John Does 1 through 5 are currently unidentified individuals who acted in concert with Defendants and/or currently unidentified individuals responsible for the creation and/or implementation of anti-retaliation and/or anti-discrimination policies of Corporate Defendant and are currently unidentified individuals who may have liability for the damages suffered by Plaintiff under any theory advanced herein.

**VENUE**

8. The causes of action which form the basis of this matter arise under Pennsylvania Human Relations Act ("PHRA") 43 P.S. §§ 951-963 and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §2000e *et seq.*

9. The District Court has jurisdiction over Counts I-II (Title VII) pursuant to 8 U.S.C. § 1331 and 42 U.S.C. § 12101, *et seq.*

10. The District Court has supplemental jurisdiction over Counts III-IV (PHRA) pursuant to 28 U.S.C. § 1367.

11. Venue is proposed in the District Court under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000(e)-5(f).

12. The unlawful acts and practices of Corporate Defendants were committed within or upon the direction of Corporate Defendants' agents, servants, employees, and/or representatives within the Commonwealth of Pennsylvania and within this District.

13. On or about September 11, 2025, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and was crossed file with Pennsylvania Human Relations Commission ("PHRC").

14. On Marh 3, 2026, the EEOC issued Plaintiff a Notice of Right to Sue.

**FACTS COMMON TO ALL CLAIMS**

15. Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

16. Plaintiff is a Black male.

17. Corporate Defendant is a beverage wholesaler that supplies beverages to retailers and restaurants in and around the Philadelphia area.

18. Plaintiff commenced employment with Corporate Defendant in or around 2017.

19. Plaintiff was promoted to Sales Representative for Corporate Defendant in or around 2021.

20. As Sales Representative, Plaintiff built and maintained relationships with retail customers through regular, route-based visits. Plaintiff's duties included, but were not limited to, taking orders, providing account support, and ensuring optimal product placement and inventory levels.

21. Indeed, at all times relevant hereto, Plaintiff was a stellar employee, with a commendable work ethic, who was dedicated to Corporate Defendant and its clients.

22. Unfortunately, despite Plaintiff's demonstrated dedication, Defendants initiated and pursued a course of discriminatory conduct specifically targeting Plaintiff because of his race.

23. Beginning in or around March 2025, Defendants engaged in blatant discrimination and racism by systematically manufacturing disciplinary actions against Plaintiff. Defendants justified their disciplinary actions on pretext, camouflaging their racial animosity towards Plaintiff.

24. On or around March 17, 2025, Defendant McMahon emailed Plaintiff and requested a meeting. When Plaintiff met with Defendant McMahon, Defendant McMahon informed Plaintiff that Plaintiff needed to improve his tracker list.

25. A "tracker list" refers to Defendants' customer visit tracking system, which helps manage and monitor route activities and account interactions. Upon information and belief, each sales representative for Corporate Defendant has an iPad equipped with the tracking system.

26. Ominously, Defendant McMahon emphasized that Plaintiff needed to improve his tracking list, "because we both know [Corporate Defendant is] *definitely looking at your tracker closer than anybody else*." (Emphasis added).

27. Days later, Defendant McMahon again articulated how Corporate Defendant was selectively reviewing Plaintiff's performance with heightened scrutiny. On or around March 20, 2025, Plaintiff met with Defendant McMahon at the Huntingdon Valley Giant location, where Defendant McMahon told Plaintiff that his work needs to be "on point" because Corporate Defendant's "*higher ups*" were focusing on Plaintiff and reviewing all of Plaintiff's activities.

28. Unfortunately, evidence of Defendants' selective targeting manifested the following day, March 21, 2025, when Defendant McMahon, Defendant Reigel, and Joe Erb pulled Plaintiff in for a meeting and wrongfully accused Plaintiff of lazily "copy and pasting" his tracking list.

29. In that same meeting, Defendants again blamed Plaintiff for product orders that were returned. However, these products were purchased online over the prior weekend, creating such an attenuated connection that no reasonable basis existed to hold Plaintiff responsible.

30. Further, on or around March 24, 2025, Plaintiff's performance was once again singled out when Defendant McMahon sent a mass email to the sales team, openly criticizing Plaintiff for items that were returned at Chelten Market IGA ("Chelten Market").

31. Responding to Defendant McMahon's email, Plaintiff spoke with Defendant McMahon over the phone and drove to Chelten Market to review their product inventory.

32. After Plaintiff reviewed the inventory at Chelten Market and assessed any discrepancies, Defendant McMahon agreed with Plaintiff that "doing [the account's] inventory is not your job. That's a courtesy we do for [them], and I'll tell [them] that myself."

33. Shockingly, despite purportedly agreeing with Plaintiff regarding the inventory discrepancy, on or around March 28, 2025, Defendant McMahon issued a write-up against Plaintiff for the returned items at Chelten Market.

34. Indeed, Defendants were nitpicking every aspect of Plaintiff's performance and holding Plaintiff to higher standard of conduct not applied to similarly situated non-Black employees.

35. Despite the ongoing hostility, Plaintiff remained committed to his role with Corporate Defendant.

36. In fact, in further evidence Plaintiff's exemplary performance, around this time, Plaintiff surpassed the sales incentive for the first quarter of 2025. Plaintiff had the highest sales points of his peers.

37. Unfortunately, Defendants changed Plaintiff's accounts a week after Plaintiff surpassed the sales incentive for the quarter.

38. As a clear example of Defendants' preferential treatment toward to white employees, Defendants stripped Plaintiff of all but two of his accounts and reassigned those accounts to a white colleague. This reassignment occurred despite Plaintiff's demonstrated success and forged business relationships with accounts.

39. On or around April 1, 2025, Plaintiff filed a grievance through his union representative challenging the written disciplinary action that Defendant McMahon took against Plaintiff on March 28, 2025.

40. Unfortunately, Defendants only intensified their discriminatory behavior towards Plaintiff after Plaintiff exercised his right to file a union grievance.

41. On April 11, 2025, Defendants precluded Plaintiff from attending a Pabst Blue Ribbon–sponsored bowling event. On this day, all Sales Representatives were scheduled to be in-office from 8:30AM-2PM. Afterward, the Sales Representatives were scheduled to attend the bowling event.

6

42. However, just as Plaintiff was leaving the office building to go to the event, Defendant McMahon stopped and told Plaintiff that he was needed in the upstairs office.

43. In the office, Defendant McMahon and Defendant Reigel berated Plaintiff for not completing a ZOA gap report.

44. Defendant McMahon and Defendant Reigel made Plaintiff spend thirty (30) minutes completing the ZOA gap report, while they simultaneously hounded Plaintiff and blamed Plaintiff for keeping them away from the bowling event.

45. After Plaintiff completed the report, Defendant McMahon reviewed it and said, "This is the wrong date. That's the one for April 4. I need the one for April 11."

46. However, Defendant McMahon never sent Plaintiff the ZOA report for the week of April 11, 2025.

47. Defendant McMahon blamed Plaintiff for not checking his emails and snatched Plaintiff's iPad, only to find out that he failed to send Plaintiff the email with the April 11 report.

48. Defendant McMahon and Defendant Reigel then made Plaintiff complete the April 11 ZOA gap report, which took approximately another 20 minutes to complete.

49. After Plaintiff finished the April 11 report, which was originally never sent to him, Defendant McMahon looked to Plaintiff and said, "It's imperative that you come to work more prepared. Grocery is not easy. We don't just wing it." Defendant McMahon once again deflected blame on Plaintiff and insinuated that Plaintiff lacks preparedness.

50. Because Defendant McMahon and Defendant Reigel prevented Plaintiff from going to the bowling event at the same time as his peers, only to harass Plaintiff about a ZOA gap report that was never sent to Plaintiff, Plaintiff did not arrive to the bowling event until approximately 4:35PM. Plaintiff was there for 25 minutes until it ended at 5PM.

51. On May 11, 2025, Plaintiff attended the grievance meeting relating to the write-up Plaintiff received on March 28, 2025. Defendant Houck, Defendant Reigel, and Defendant McMahon all attended this meeting. Ultimately, the grievance was ruled in favor of Plaintiff, resulting in the disciplinary measure being vacated.

52. Unfortunately, Plaintiff's good-standing disciplinary record was short-lived, as mere weeks later, Defendants manufactured two write-ups against Plaintiff, based on absurd, pretextual reasonings.

53. On or around May 30, 2025, Defendant McMahon, Defendant Reigel, and Joe Erb pulled Plaintiff into the office and issued Plaintiff two write-ups.

54. The first write-up that Plaintiff received on May 30, 2025, was for missing an order from Wawa on April 11, 2025.

55. Unsurprisingly, April 11, 2025, was the same day that Defendants required Plaintiff to be in-office and ultimately withheld Plaintiff from attending the Pabst Blue Ribbon–sponsored bowling event.

56. In fact, prior to April 11, 2025, Plaintiff actually approached Defendant McMahon and asked permission to leave the office that day to take the order from Wawa. However, Defendant McMahon responded, "I'm not sure. We'll see how the day goes."

57. Indeed, Plaintiff, an attentive employee, followed up with Defendant McMahon on the morning of April 11, 2025, seeking permission to take the order. This time, Defendant McMahon responded, "I'll let you know."

58. Clearly, the write-up that Defendants issued against Plaintiff on May 30, 2025, regarding the Wawa order, was without merit as Defendant McMahon withheld Plaintiff from fulfilling the order.

8

59. Defendants justified issuing the second write-up against Plaintiff on the grounds that one of Plaintiff's accounts had an "expired QR code" displayed on a sign.

60. Plaintiff, however, in his extended tenure of employment with Corporate Defendant, had never heard of another employee receiving disciplinary action because of an "expired QR code."

61. As such, after receiving two frivolous write-ups, Plaintiff reasonably believed that Defendants were working to precipitate Plaintiff's departure from the company through an escalating series of discriminatory measures.

62. To make matters worse, on June 13, 2025, Defendants issued yet another write-up and suspended Plaintiff for missing an order.

63. Finally, on June 16, after enduring several months of blatant discrimination, harassment, and Defendants' deliberate efforts to contrive reasons for disciplinary action, Plaintiff emailed a formal complaint to Corporate Defendant's Human Resources (HR) Manager, Glenda Pizarro, regarding Defendants' racial discrimination.

64. Plaintiff's email complaint to Glenda reads:

> ***I have made a complaint before about being singled out and being targeted. Black employees are constantly held to a different standard. I have received several write ups, and it is blatant racism. My write ups are ridiculous, even for "expired QR codes sign", which I know none of my white employees has ever gotten writtenup for.*** I have been at Muller for about 8 years and I have received more writeups in the last 3 months than any years I've been here. ***I can give many examples how [Defendant McMahon] and [Defendant Reigel] is holding me to a different standard racially.*** Is there any way you can start a formal investigation into these issues and retract my discipline asap? This stuff should not be on my record. Thank you.

(Emphasis added.)

9

65. The relentless discrimination and workplace hostility became so severe that Plaintiff was left with no choice but to report Defendant McMahon and Defendant Reigel to HR.

66. Unsurprisingly, immediately following Plaintiff's report of discrimination, Defendants initiated a retaliatory campaign against Plaintiff.

67. Defendants responded to Plaintiff's complaint of discrimination by subjecting Plaintiff to increased micromanagement and burdensome supervision, all while intensifying their orchestrated efforts to force Plaintiff's removal from the company.

68. On June 18, 2025, just two days after Plaintiff filed his complaint with the Human Resource Manager, Plaintiff was working his route, visiting accounts, and noticed that Defendant McMahon was *following* him in a nearby vehicle.

69. Upon information and belief, Defendant McMahon was following Plaintiff as Plaintiff visited accounts, in efforts to discover Plaintiff committing an infraction.

70. Shortly thereafter, on July 2, 2025, Plaintiff arrived for work and drove to the first account on his route for that day. When Plaintiff arrived at the location of the first account, he noticed Defendant Houck waiting there.

71. Defendant Houck's presence surprised Plaintiff, as normally Corporate Defendant releases a schedule one month in advance that describes which employees will be working with each other on a specific day.

72. Because Plaintiff was not scheduled to work with Defendant Houck on July 2nd, 2025, Plaintiff asked Defendant Houck why he was there. Shockingly, Defendant Houck admitted Defendants' intention to surprise Plaintiff, stating that the "***the higher up doesn't want me announcing who I'm working with ahead of time***."

73. Similarly, a few days afterwards, Plaintiff arrived at the location of its first account on July 7, 2025, only to find Defendant Reigel waiting there. This time, Defendant Reigel told Plaintiff that Corporate Defendant "***told me not to notify you***" about days which Defendant Reigel would be working alongside Plaintiff.

74. Clearly, Defendants implemented an intensified micromanagement strategy, subjecting Plaintiff to heightened surveillance and scrutinizing his every action in search of grounds for disciplinary action.

75. As if Defendants' conduct was not egregious enough, on July 18, 2025, Plaintiff discovered that Defendant McMahon had been deliberately manufacturing workplace situations designed to position Plaintiff for failure and generate artificial grounds for disciplinary action.

76. On July 10, 2025, Plaintiff entered the store of one of his accounts, the ShopRite of Roxborough, and discovered a three-sided Miller High Life sign with an expired QR code. The code had expired almost a year prior.

77. Plaintiff was initially perplexed by the sign, as he knew with certainty that he did not place the sign inside the store.

78. Plaintiff grabbed the sign and began removing it from the floor, until the Beer Manager for ShopRite noticed Plaintiff and said, "Hey, what are you doing with that sign?"

79. Plaintiff, having already received a write-up for an "expired QR code", informed the Beer Manager that the sign had an expired code and needed to be taken down. Shockingly, the Beer Manager responded, "***What? [Defendant McMahon] put that sign up about two weeks ago.***"

80. The Beer Manager even reassured Plaintiff as much. Plaintiff questioned whether the Beer Manager remembered with surety, to which she responded, "***Yes, he put it up in June.***"

11

81. Based on this discovery, Plaintiff reasonably believed that Defendant McMahon was deliberately placing signs with expired QR codes at Plaintiff's accounts, and then later subjecting Plaintiff to disciplinary actions for those signs.

82. Fearful of what retaliatory measures might occur next, with nowhere else to turn, Plaintiff followed up with the Human Resource Manager in an email on July 18, 2025:

> Hey Glenda, over a month ago I sent you an email asking that you launch an investigation in [Defendant McMahon] and [Defendant Reigel] for racial targeting me. Is there any update on this investigation? Also if your [sic] available this morning, *I really need to talk to you. It's about this situation and it's EXTREMELY important*. I will be at Muller this morning by 8:30am, please let me know if you're able to meet.

(Emphasis added.)

83. However, Corporate Defendant's HR Manager could not be bothered and did not allow Plaintiff to meet with her. Instead, she responded "All investigations are handled by Jack Gant and HR. Jack has been on vacation, upon his return I will inform him you need to meet with us."

84. Indeed, Plaintiff met with representatives of Corporate Defendant five days later on July 23, 2025.

85. Unfortunately, in this meeting, Corporate Defendant's retaliatory campaign came to a head. Jack Gant informed Plaintiff that *following Plaintiff's complaint regarding Defendants' racial discrimination*, *Corporate Defendant initiated an investigation into Plaintiff's himself*. Then, in blatant retaliation for Plaintiff's complaints of racism and discrimination, Corporate Defendant terminated Plaintiff's employment on pretextual grounds of "stealing company time."

86. Plaintiff was terminated in blatant retaliation for Plaintiff's complaints of unlawful conduct.

87. Defendants justified Plaintiff's termination on pretextual grounds that Plaintiff was "stealing company time." This justification for Plaintiff's termination is clearly pretextual and a complete farce. Defendants' justification is a misguided attempt to cover up their retaliatory termination on account of Plaintiff's complaints of racism and discrimination.

88. The temporal proximity alone between Plaintiff's reports of workplace racism and microaggressions and his termination is indicative of Defendants' discriminatory and retaliatory motives.

89. Non-Black employees were not treated in such a manner.

90. Defendants failed to adequately investigate and take proper remedial action in response to Plaintiff's complaints.

91. Defendants terminated Plaintiff in direct retaliation for his complaints and sought to deter other employees from speaking up against Defendants' unlawful discrimination in the future.

92. Defendant McMahon was directly involved, personally involved, and/or aided and abetted in both the aforementioned unlawful conduct and the decision to wrongfully terminate Plaintiff.

93. Defendant Reigel was directly involved, personally involved, and/or aided and abetted in both the aforementioned unlawful conduct and the decision to wrongfully terminate Plaintiff.

94. Defendant Houck was directly involved, personally involved, and/or aided and abetted in both the aforementioned unlawful conduct and the decision to wrongfully terminate Plaintiff.

95. As a result of Defendants' unlawful conduct, Plaintiff suffered and continues to suffer from extreme emotional distress and significant financial harm.

**COUNT ONE**
**TITLE VII – DISCRIMINATION AND DISPARATE TRETAMENT DUE TO RACE**
**(Against Corporate Defendant)**

96. The preceding paragraphs are incorporated by reference as if fully set forth herein.

97. Plaintiff was subjected to discrimination by Defendants on account of his race.

98. At all relevant times, Plaintiff was qualified for her position.

99. Plaintiff is a Black male.

100. Plaintiff was subjected to disparate treatment because of his race.

101. The above-described conduct would not have occurred but for Plaintiff's race and complaints of racial discrimination.

102. The acts, failures to act, and conduct of Defendants set forth above constitute unlawful discrimination on the basis of Plaintiff's race, in violation of Plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*.

103. Said violations were intentional and willful.

104. As a result of the above discriminatory conduct, Plaintiff experiences ongoing and debilitating emotional distress and experiences significant economic damages.

**WHEREFORE**, Plaintiff, respectfully demands judgment in his favor and against Defendants, and seeks all appropriate remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, as amended, including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## COUNT TWO
## TITLE VII – RETALIATION
## (Against Corporate Defendant)

105.   The preceding paragraphs are incorporated by reference as if fully set forth.

106.   The acts, failures to act, and conduct of Defendants set forth above constitute retaliation against Plaintiff for exercising his rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, as amended.

107.   Defendants retaliated against Plaintiff for engaging in protected activities, namely, for reporting racial discrimination.

108.   Defendants, by and through its employees, retaliated against Plaintiff for having exercised his rights under federal and state law.

109.   Said violations were intentional and willful.

110.   As a result of the above discriminatory conduct, Plaintiff experiences ongoing and debilitating emotional distress and experiences significant economic damages.

**WHEREFORE**, Plaintiff respectfully demands judgment in his favor and against Defendants and seeks all appropriate remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq.*, as amended, including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## COUNT THREE
## PENNSYLVANIA HUMAN RELATIONS ACT (PHRA) – DISPARATE TREATMENT & DISCRIMINATION DUE TO RACE
## (Against All Defendants)

111.   Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

112. The acts, failures to act, and conduct of Defendants set forth above constitute unlawful discrimination on the basis of race in violation of Plaintiff's rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

113. The pattern and practice of discrimination and retaliation directed at Plaintiff is outlined above.

114. During the course of his employment with Corporate Defendant, Plaintiff demonstrated he was qualified and performed the essential functions of his position.

115. During the course of his employment with Corporate Defendant, Plaintiff was subjected to discrimination and disparate treatment—with regard to the terms, conditions, and privileges of her employment— on the basis of race.

116. The above-described conduct would not have occurred but for Plaintiff's race and/or complaints about racism and microaggressions.

117. Defendants did not have an effective anti-discrimination policy in place, Defendants have not maintained an anti-discrimination policy that is current and effective, and Defendants' anti-discrimination policy existed in name only.

118. Defendants did not maintain useful formal and informal complaint structures for victims of discrimination.

119. Defendants did not properly train their supervisors and/or employees on the subject of discrimination and retaliation.

120. Defendants failed to institute appropriate monitoring mechanisms to check the effectiveness of the policies and complaint structures.

121. Defendants did not have a commitment from the highest levels of management that discrimination will not be tolerated.

122. As a result of the above discriminatory conduct, Plaintiff experiences ongoing and debilitating emotional distress and significant economic damages.

123. As the employers and/or supervisors of Plaintiff, Individual Defendants are vicariously, strictly, and/or directly liable to Plaintiff pursuant to the PHRA, in that the affirmative acts of discrimination committed by Individual Defendants occurred within the scope of their employment; and/or Defendants were deliberately indifferent, reckless, negligent and/or tacitly approved the discrimination; and/or Defendants failed to create and/or have in place well-publicized and enforced anti-discrimination policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms for same despite the foreseeability of discrimination in the workplace; and/or by having actual knowledge of the discrimination of Plaintiff and failing to promptly and effectively act to stop it.

124. Corporate Defendant aided, abetted, incited, compelled, and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Individual Defendants to commit acts and omissions that were in violation of the PHRA by committing affirmatively discriminatory acts towards Plaintiff in violation of their supervisory duties to halt or prevent discrimination, subjecting Defendants to liability to Plaintiff pursuant to 43 P.S. § 955(e).

125. Individual Defendants aided, abetted, incited, compelled, and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Corporate Defendant to commit acts and omissions that were in violation of the PHRA by committing affirmatively discriminatory acts towards Plaintiff in violation of their supervisory duties to halt or prevent discrimination, subjecting Individual Defendants to liability to Plaintiff pursuant to 43 P.S. § 955(e).

126. As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff respectfully demands judgment in his favor and against Defendants and seeks all appropriate remedies under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

### COUNT FOUR
### PENNSYLVANIA HUMAN RELATIONS ACT – RETALIATION
### (Against All Defendants)

127. Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

128. The acts, failures to act, and conduct of Defendants set forth above constitute retaliation against Plaintiff for exercising his rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

129. Plaintiff engaged in a protected activity when he complained and/or protested against the continuing course of discriminatory and retaliatory conduct set forth at length above. Defendants had knowledge about those complaints and/or protests.

130. The retaliation directed at Plaintiff included but is not limited to, requiring Plaintiff to endure racism as a condition of employment and terminating Plaintiff's employment when he reported workplace racism and microaggressions.

131. Plaintiff was affirmatively terminated by Defendants in retaliation for making complaints about Defendants' conduct and due to Defendants' failure to take corrective and remedial action. As a direct result, Defendants took retaliatory action against Plaintiff, which is outlined above.

132. The close temporal proximity between Plaintiff's protected activity and Defendants' adverse employment action establishes causation.

133. As a direct and proximate cause of the Defendants' unlawful acts and omissions as previously mentioned, Plaintiff has been discharged from his position of employment with Corporate Defendant.

134. Individual Defendants are vicariously, strictly and/or directly liable to Plaintiff for unlawful retaliatory conduct in violation of the PHRA pursuant to 43 P.S. § 955(e).

135. As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained emotional and pecuniary damages.

**WHEREFORE**, Plaintiff respectfully demands judgment in his favor and against Defendants and seeks all appropriate remedies under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury on all issues.

Dated: March 5, 2026          By:     /s/ *Matthew A. Luber*
                                      Matthew A. Luber, Esq. – PA ID No. 309323
                                      Tyler J. Burrell, Esq. – PA ID No. 332373
                                      William A. Carr, Esq. – PA ID No. 200274
                                      McOMBER McOMBER & LUBER, P.C.
                                      50 Lake Center Drive, Suite 400
                                      Marlton, NJ 08053
                                      Phone: (856) 985-9800
                                      Fax: (856) 263-2450
                                      mal@njlegal.com
                                      wlc@njlegal.com
                                      tjb@njlegal.com
                                      *Attorneys for Plaintiff, Maxwell Gedeus*